UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ANDREW J.J. WOLF,<br><br>                    Plaintiff,<br><br>        v.<br><br>JOSH TEWALT; CHAD PAGE;<br>AMANDA GENTRY; RANDY<br>VALLEY; TYRELL DAVIS; NICK<br>BAIRD; JUSTIN GIBNEY;<br>JONATHAN RIELY; MARY<br>ANKENBRANDT; JAY<br>CHRISTENSEN; DAVID E. DIETZ;<br>TYLER NICODEMUS; JOSHUA<br>RANKIN; RONA SIEGERT;<br>CORIZON HEALTH, INC.; PATRICK<br>JONES; ADREA NICODEMUS; and<br>JOHN AND JANE DOES A–Z,<br><br>                    Defendants. | Case No. 1:21-cv-00226-DCN<br><br>**INITIAL REVIEW ORDER BY<br>SCREENING JUDGE** |

The Clerk of Court conditionally filed Plaintiff Andrew J.J. Wolf's initial complaint as a result of Plaintiff's status as an inmate and in forma pauperis request. Plaintiff has since filed an Amended Complaint.

The Court now reviews the Amended Complaint to determine whether it or any of the claims contained therein should be summarily dismissed under 28 U.S.C. §§ 1915 and 1915A. Having reviewed the record, and otherwise being fully informed, the Court enters the following Order.

1.     **Screening Requirement**

The Court must review complaints filed by prisoners seeking relief against a governmental entity or an officer or employee of a governmental entity, as well as complaints filed in forma pauperis, to determine whether summary dismissal is appropriate. The Court must dismiss a complaint or any portion thereof that states a frivolous or malicious claim, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. §§ 1915(e)(2)(B) & 1915A(b).

2.     **Pleading Standard**

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint fails to state a claim for relief under Rule 8 if the factual assertions in the complaint, taken as true, are insufficient for the reviewing court plausibly "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[D]etailed factual allegations" are not required, but a plaintiff must offer "more than ... unadorned, the-defendant-unlawfully-harmed-me accusation[s]." *Id.* (internal quotation marks omitted). If the facts pleaded are "merely consistent with a defendant's liability," or if there is an "obvious alternative explanation" that would not result in liability, the complaint has not stated a claim for relief that is plausible on its face. *Id.* at 678, 682 (internal quotation marks omitted). Additionally, if an affirmative defense, such as untimeliness, is an "obvious bar to securing relief on the face of the complaint," dismissal under §§ 1915 and 1915A is appropriate. *Washington v. Los Angeles Cty. Sheriff's Dep't*, 833 F.3d 1048, 1056

(9th Cir. 2016) (internal quotation marks omitted). Finally, a court is not required to comb through a plaintiff's exhibits or other filings to determine if the complaint states a plausible claim.[1]

### 3. Discussion

Plaintiff is a prisoner in the custody of the Idaho Department of Correction ("IDOC"), currently incarcerated at the Idaho State Correctional Center ("ISCC"). Some of Plaintiff's claims arose when he was incarcerated at the Idaho Maximum Security Institution ("IMSI").

The Amended Complaint asserts Eighth Amendment failure-to-protect claims, and related state-law negligence claims, with respect to conditions of confinement at both IMSI and ISCC, asserting that those conditions have placed Plaintiff at a substantial risk of serious harm (claims 1 through 4). *Id*. at 17–18. Plaintiff also asserts Eighth Amendment claims of inadequate medical treatment with respect to vision problems and injuries to Plaintiff's eyes (claim 5). *Id*. at 18.

#### A. Timeliness Issues

As an initial matter, some of Plaintiff's claims may be untimely, although the Court will not dismiss any claims on that basis at this time. *See Am. Compl*. at 8–9, 14–15 (discussing events that occurred in 2018 and earlier). The statute of limitations period for filing a civil rights suit under § 1983 is the same statute of limitations period for personal injuries in the state where the claim arose. *Wilson v. Garcia*, 471 U.S. 261, 280 (1985),

---

[1] Therefore, in its review under §§ 1915 and 1915A, the Court has reviewed only the Amended Complaint found at Docket No. 7, not the exhibits or any other documents submitted by Plaintiff. *See* Dkt 10.

*abrogated on other grounds by Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369 (2004). Therefore, Idaho's two-year statute of limitations period applies to both Plaintiff's § 1983 claims and his state-law negligence claims. Idaho Code § 5-219.

Though the state statute of limitations governs the deadline for filing a § 1983 claim, federal law governs when that claim accrues, or arises. *Elliott v. City of Union City*, 25 F.3d 800, 801–02 (9th Cir. 1994). Under the "discovery rule," a claim accrues "when the plaintiff knows or has reason to know of the injury" that is the basis of the claim. *Lukovsky v. City & Cty. of San Francisco*, 535 F.3d 1044, 1048 (9th Cir. 2008) (internal quotation marks omitted). That is, the statute of limitations begins to run when the plaintiff becomes aware of the actual injury—not "when the plaintiff suspects a legal wrong." *Id.*

If a plaintiff cannot show that his claim arose during the statute of limitations period, he still may file a lawsuit beyond the limitations deadline if he can show that the statute should have been tolled (or paused) for a certain period of time during the deadline period within which he should have filed the lawsuit. Pursuant to the Prison Litigation Reform Act ("PLRA"), the "statute of limitations must be tolled while a prisoner completes the mandatory exhaustion process." *Brown v. Valoff,* 422 F.3d 926, 943 (9th Cir. 2005).

In addition to tolling under the PLRA, state tolling law applies to § 1983 actions unless important federal policy will be undermined. *See Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 464-65 (1975); *Pesnell v. Arsenault*, 543 F.3d 1038, 1043 (9th Cir. 2008). Idaho law allows for statutory tolling of the statute of limitations for a person's juvenile status or insanity. Idaho Code § 5-230. However, because the Idaho Supreme Court has determined that "[s]tatutes of limitation in Idaho are not tolled by judicial

construction but rather by the expressed language of the statute," equitable tolling is not available in Idaho.[2] *Wilhelm v. Frampton*, 158 P.3d 310, 312 (Idaho 2007).

Given these legal standards, any claims that arose more than two years and thirty days (accounting for exhaustion) before the filing of the initial complaint in this action may be time-barred.

### B.   *Section 1983 Claims*

Plaintiff brings claims under 42 U.S.C. § 1983, the civil rights statute. To state a plausible civil rights claim, a plaintiff must allege a violation of rights protected by the Constitution or created by federal statute proximately caused by conduct of a person acting under color of state law. *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). To be liable under § 1983, "the defendant must possess a purposeful, a knowing, or possibly a reckless state of mind." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2472 (2015). Negligence is not actionable under § 1983, because a negligent act by a public official is not an abuse of governmental power but merely a "failure to measure up to the conduct of a reasonable person." *Daniels v. Williams*, 474 U.S. 327, 332 (1986).

Prison officials generally are not liable for damages in their individual capacities under § 1983 unless they personally participated in the alleged constitutional violations.

---

[2] The doctrine of equitable *estoppel*, however, is available in Idaho. While it "does not 'extend' a statute of limitation," equitable estoppel works in a similar manner to prevent a party who has falsely represented or concealed a material fact with actual or constructive knowledge of the truth "from pleading and utilizing the statute of limitations as a bar, although the time limit of the statute may have already run." *J.R. Simplot Co., v. Chemetics International, Inc.*, 887 P.2d 1039, 1041 (Idaho 1994). Equitable estoppel requires a showing of four elements: "(1) a false representation or concealment of a material fact with actual or constructive knowledge of the truth; (2) that the party asserting estoppel did not know or could not discover the truth; (3) that the false representation or concealment was made with the intent that it be relied upon; and (4) that the person to whom the representation was made, or from whom the facts were concealed, relied and acted upon the representation or concealment to his prejudice." *Id*.

*Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989); *see also Iqbal*, 556 U.S. at 677 ("[E]ach Government official, his or her title notwithstanding, is only liable for his or her own misconduct."). Section 1983 does not allow for recovery against an employer or principal simply because an employee or agent committed misconduct. *Taylor*, 880 F.2d at 1045.

However, "[a] defendant may be held liable as a supervisor under § 1983 'if there exists ... a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.'" *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (quoting *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989)). A plaintiff can establish this causal connection by alleging that a defendant (1) set in motion a series of acts by others that violated the Constitution, or knowingly refused to terminate a series of such acts, which the supervisor "knew or reasonably should have known would cause others to inflict a constitutional injury"; (2) knowingly failed to act or acted improperly "in the training, supervision, or control of his subordinates"; (3) acquiesced in the constitutional deprivation; or (4) engaged in "conduct that showed a reckless or callous indifference to the rights of others." *Id*. at 1205–09 (internal quotation marks omitted). A plaintiff may also seek injunctive relief from officials who have direct responsibility in the area in which the plaintiff seeks relief. *See Rounds v. Or. State Bd. of Higher Educ*., 166 F.3d 1032, 1036 (9th Cir. 1999).

To bring a § 1983 claim against a municipality or a private entity performing a government function—such as Corizon, the private entity providing Idaho inmates with medical care under contract with the IDOC—a plaintiff must allege that the execution of an official policy or unofficial custom inflicted the injury of which the plaintiff complains,

as required by *Monell v. Department of Social Services of New York*, 436 U.S. 658, 694

(1978). *See also Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1139 (9th Cir. 2012) (applying

*Monell* to private entities performing a government function). Under *Monell*, the requisite

elements of a § 1983 claim against a municipality or private entity performing a state

function are the following: (1) the plaintiff was deprived of a constitutional right; (2) the

municipality or entity had a policy or custom; (3) the policy or custom amounted to

deliberate indifference to plaintiff's constitutional right; and (4) the policy or custom was

the moving force behind the constitutional violation. *Mabe v. San Bernardino Cnty.*, 237

F.3d 1101, 1110-11 (9th Cir. 2001). Further, a municipality or private entity performing a

state function "may be held liable under § 1983 when the individual who committed the

constitutional tort was an official with final policy-making authority or such an official

ratified a subordinate's unconstitutional decision or action and the basis for it." *Clouthier*

*v. County of Contra Costa*, 591 F.3d 1232, 1250 (9th Cir. 2010), *overruled in part on other*

*grounds by Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1069 (9th Cir. 2016) (en banc).

An unwritten policy or custom must be so "persistent and widespread" that it

constitutes a "permanent and well settled" practice. *Monell*, 436 U.S. at 691 (quoting

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-168 (1970)). "Liability for improper

custom may not be predicated on isolated or sporadic incidents; it must be founded upon

practices of sufficient duration, frequency and consistency that the conduct has become a

traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir.

1996).

A claim that a supervisor or training official failed to adequately train subordinates

ordinarily requires that, "in light of the duties assigned to specific officers or employees[,] the need for more or different training [was] so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the [supervisor or training official] can reasonably be said to have been deliberately indifferent to the need." *City of Canton v. Harris*, 489 U.S. 378, 390 (1989). That is, to maintain a failure-to-train claim, a plaintiff must allege facts showing a "pattern of violations" that amounts to deliberate indifference. *Connick v. Thompson*, 563 U.S. 51, 72 (2011). Likewise, "a failure to supervise that is sufficiently inadequate may amount to deliberate indifference" that supports a § 1983 claim, but there generally must be a pattern of violations sufficient to render the need for further supervision obvious. *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (internal quotation marks omitted). That is, if a training official had "knowledge of the unconstitutional conditions" through such a pattern of violations—including knowledge of the "culpable actions of his subordinates"—yet failed to act to remedy those conditions, that official can be said to have acquiesced "in the unconstitutional conduct of his subordinates" such that a causal connection between the supervisor and the constitutional violation is plausible. *Starr*, 652 F.3d at 1208.

Administrative or supervisory defendants who were involved in reviewing claims in an administrative grievance process might or might not be liable for the constitutional violations complained of in those grievances, depending on (1) the type and timing of problem complained of, and (2) the role of the defendant in the process. For example, an appeals coordinator cannot cause or contribute to a completed constitutional violation, which occurred in the past and which is not remediable by any action the reviewer might

take. *See, e.g., George v. Smith*, 507 F.3d 605, 609–610 (7th Cir. 2007) ("A guard who stands and watches while another guard beats a prisoner violates the Constitution; a guard who rejects an administrative complaint about a completed act of misconduct does not."). A defendant whose only role in a completed constitutional violation involved the denial of a grievance "cannot be liable under § 1983." *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999).

If, however, the administrative or supervisory defendant "knew of an ongoing constitutional violation and … had the authority and opportunity to prevent the ongoing violation," yet failed to act to remedy the violation, then the defendant may be held liable under § 1983. *Herrera v. Hall*, 2010 WL 2791586 at *4 (E.D. Cal. July 14, 2010) (unpublished) (citing *Taylor*, 880 F.2d at 1045), *report and recomm'n adopted*, 2010 WL 3430412 (E.D. Cal. Aug. 30, 2010). Where claims are asserted against persons who supervise the provision of prison medical care, the question is not whether the supervisor was "directly involved" in the plaintiff's medical treatment. *Gonzalez v. Ahmed*, 67 F. Supp. 3d 1145, 1156 (N.D. Cal. 2014). Instead, the question is whether the complaint plausibly alleges that the supervisor "knowing[ly] fail[ed] to address" the treating provider's deficient care, thereby interfering with the plaintiff's medical treatment. *Id.*

Plaintiff asserts his § 1983 claims under the Eighth Amendment of the United States Constitution, which protects prisoners against cruel and unusual punishment. In considering whether prison conditions are cruel and unusual, a court must examine the challenged condition and "determine whether that condition is compatible with the evolving standards of decency that mark the progress of a maturing society." *Wright v.*

*Rushen*, 642 F.2d 1129, 1133 (9th Cir. 1981) (internal quotation marks omitted).

A prison has met its constitutional obligations "if it furnishes sentenced prisoners with adequate food, clothing, shelter, sanitation, medical care, and personal safety…. There is no Eighth Amendment violation if each of these basic needs is separately met." *Hoptowit v. Ray*, 682 F.2d 1237, 1246 (9th Cir. 1982) (internal quotation marks omitted), *abrogated on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995)).

To state a claim under the Eighth Amendment, a prisoner must show that he is (or was) "incarcerated under conditions posing a substantial risk of serious harm," or that he has been deprived of "the minimal civilized measure of life's necessities" as a result of the defendant's actions. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotation marks omitted). An Eighth Amendment claim requires the plaintiff to satisfy both (1) an objective standard, "that the deprivation was serious enough to constitute cruel and unusual punishment, and (2) a subjective standard, that the defendant acted with "deliberate indifference." *Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012), *overruled in part on other grounds by Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014) (en banc).

To rise to the level of an Eighth Amendment violation, the deprivation alleged must be objectively sufficiently harmful, *Farmer*, 511 U.S. at 834, or, in other words, sufficiently "grave" or "serious," *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). As the United States Supreme Court has explained:

> Not every governmental action affecting the interests or well-being of a prisoner is subject to Eighth Amendment scrutiny, however. After incarceration, only the unnecessary and wanton infliction of pain constitutes cruel and unusual punishment forbidden by the Eighth Amendment. To be cruel

INITIAL REVIEW ORDER BY SCREENING JUDGE - 10

> and unusual punishment, conduct that does not purport to be
> punishment at all must involve more than ordinary lack of due
> care for the prisoner's interests or safety.

*Whitley v. Albers*, 475 U.S. 312, 319 (1986) (internal quotation marks, citation, and

alteration omitted).

With respect to the subjective prong of an Eighth Amendment claim, a defendant

acts with deliberate indifference only if the defendant (1) was aware of the risk to the

prisoner's health or safety, and (2) deliberately disregarded that risk. *Farmer*, 511 U.S. at

837. That is, a defendant "must both be aware of facts from which the inference could be

drawn that a substantial risk of serious harm exists, and he must also draw the inference."

*Id*. "If a [prison official] should have been aware of the risk, but was not, then the [official]

has not violated the Eighth Amendment, no matter how severe the risk." *Gibson v. Cty. of*

*Washoe*, 290 F.3d 1175, 1188 (9th Cir. 2002), *overruled on other grounds by Castro v.*

*Cty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016). Moreover, even prison officials who

*did* subjectively know of a substantial risk to an inmate's health or safety will not be liable

under § 1983 "if they responded reasonably to the risk, even if the harm ultimately was not

averted." *Farmer*, 511 U.S. at 844.

A plaintiff cannot simply restate these standards of law in a complaint. Rather, a

plaintiff must provide specific facts supporting the elements of each claim and must allege

facts showing a causal link between each defendant and Plaintiff's injury or damage.

Alleging "the mere possibility of misconduct" is not enough. *Iqbal*, 556 U.S. at 679.

Plaintiff brings two different types of Eighth Amendment claims—failure to protect

him from assault by other inmates, and failure to provide him with adequate medical

treatment.

### C.    *Failure-to-Protect Claims*

#### i.    <u>Factual Allegations</u>

After being found guilty of a Class A Disciplinary Offense Report ("DOR"), Plaintiff was reclassified as a close custody inmate.[3] *Id*. at 8. "Close custody" means confinement "within a secure perimeter … and under staff supervision 24 hours per day, seven days per week," and the movement of close custody inmates within the prison is "limited, controlled, and supervised by facility staff." *See* IDOC SOP 303.02.01.001 at 7, http://forms.idoc.idaho.gov/WebLink/0/edoc/284983/Classification%20Inmate%20-%20SOP.pdf, "Classification: Inmate" (accessed Sept. 28, 2021). Close custody is designed for inmates who (1) have an "[e]scape history from a secure perimeter or secure facility," (2) have a "[s]erious institutional disciplinary history," meaning that they have been found guilty of a Class A DOR, or (3) have "displayed dangerous behavior while incarcerated." *Id*.

In May 2018, Plaintiff was transferred to IMSI from another prison and, in addition to remaining classified as close custody, was also placed in administrative segregation. *Am. Compl.* at 9. Administrative segregation, or "ad-seg," is a restrictive housing unit. Ad-seg is reserved "for those offenders who pose a threat to life, property, self, staff, or other

---

[3] The Court takes judicial notice of Plaintiff's Amended Complaint in another case, in which Plaintiff stated he was found guilty of a DOR for "Sexual Abuse 1 – Level 1 Class A." *Wolf v. Sandy*, No. 1:20-cv-00025-BLW, Dkt. 12 at 11 (D. Idaho) (Am. Compl. filed March 9, 2020). A DOR for that offense "requires penetration, no matter how slight, of the vagina or anus with any body part or object, or oral penetration by a sex organ of another person without the consent of the victim or by coercion." *Id*., Dkt. 13 at 28–29 (Initial Rev. Order filed May 12, 2020) (quoting IDOC SOP 318.02.01.001, "Disciplinary Offenses") (cleaned up).

offenders" and whose "continued presence threatens the secure and orderly operation of the facility." *See* IDOC SOP 319.02.01.001 at 1, http://forms.idoc.idaho.gov/WebLink/0/edoc/341649/Restrictive%20Housing%20-%20SOP.pdf, "Restrictive Housing" (accessed Sept. 28, 2021).

At IMSI, inmates in close custody housing units are periodically allowed out of their cells on "walks." *Am. Compl.* at 10. Each unit has four walks, "which consist of 8 cells with 16 prisoners." *Id*. There are two types of walks: "hard walks" and "soft walks."

Hard walks are reserved for "prisoners who have a propensity of violence towards other prisoners and staff" and for members of prison gangs, which are known as Security Threat Groups ("STG"). *Id*. According to Plaintiff, soft walks include (1) "vulnerable prisoners," such as inmates who, like Plaintiff, have been convicted of sex offenses, and (2) "non-STG" inmates, meaning inmates who are not members of a prison gang.

Plaintiff alleges that IDOC's policy is to segregate close custody STG inmates by gang membership. These STG inmates, who are on hard walks, are in the same "unit" as inmates on soft walks. *Id*. IDOC then segregates the soft walks from the hard walks "by Tier" and "intermix[es] them on each Close Custody Housing Tier Unit." *Id*. As a result, it appears that—although hard walk inmates are segregated from soft walk inmates—hard walk inmates can, at least to some extent, communicate with soft walk inmates in the same unit.

On February 21, 2021, Plaintiff's soft walk "was let out for their dayroom time." *Id*. at 10. Another inmate, who was on the same soft walk as Plaintiff, "rushed towards [Plaintiff] and punched him in the face, then pushed him into [his] cell and shut the door."

INITIAL REVIEW ORDER BY SCREENING JUDGE - 13

*Id*. at 11. The inmate "began to batter [Plaintiff] by striking him in the head and face with his fists and then with his knee to the face and eyes." *Id*. Two correctional officers ordered the inmate to stop. When he did not do so, the officers deployed a burst of "O/C Spray" through the door slot of the cell.[4] Although the O/C spray stopped the inmate from assaulting Plaintiff, the spray also hit Plaintiff in the face and eyes. *Id*.

Plaintiff later learned that thirteen months before the assault, the same inmate had committed a "felony aggravated battery" against another inmate at a different prison—an assault for which the inmate was being prosecuted. *Id*. at 11–12. Plaintiff informed Defendants Davis and Gibney of this information and asked why the other inmate had been placed on a soft walk instead of a hard walk when he was transferred to IMSI. Defendant Davis seemed to be shocked. *Id*. at 12.

On March 3, 2021, Plaintiff was in the dayroom speaking with an LGBTQ prisoner. Another inmate, "who had just arrived from [another prison's] Restrictive Housing a day or two before," came up behind the LGBTQ prisoner "and began to strike him in the head and face with something in his fist to cause injury." *Id*. At the time of this assault, security staff were not immediately able to intervene—"they did not have enough staff to enter the tier to stop it as IDOC SOPs and policies require at least 4 correctional officers to enter the tier when an assault is taking place." *Id*. at 13.

Plaintiff later discovered that the inmate who committed the March 3 assault had bragged at his previous prison that, when he was transferred to IMSI, he "was going to 'put

---

[4] "O/C spray" is "oleoresin capsicum spray," also referred to as pepper spray.

in a piece.'" *Id*. Plaintiff understood this to mean that the inmate "was going to attack a vulnerable prisoner for the STG prisoners." *Id*. at 13. Plaintiff contends that the ability to communicate between inmates on hard walks and soft walks—a result of IDOC's practice of having soft walks and hard walks "on the same close custody units"—made it possible for an unidentified STG inmate on a hard walk to instruct the soft walk inmate to attack the LGBTQ prisoner.

On April 29, 2021, Plaintiff was transferred from IMSI to ISCC and learned that the prison was "approximately 44 correctional officer[s] short to fully operate ISCC." *Id*. Warden Christensen held a "Townhall" meeting with ISCC inmates and acknowledged the staffing problem. Christensen stated the following:

- "It's hard to find people that want to work."

- "People are not motivated to go to work because the unemployment rate is high—upwards of $19/hour."

- "The end to unemployment benefits is coming to an end and we are starting to see an uptick in people applying for jobs."

- "Close to 60 officers down at ISCC."

- "Would like to open the facility back up but we can't until we get enough staff and get into the right color category."

*Id*. These statements appear to indicate that, due to the COVID-19 pandemic and the resulting unemployment benefits, the prison was forced to lock down—or at least not "fully operate"—more frequently than it generally has needed to do during non-pandemic times.

Shortly after Plaintiff's transfer to ISCC, Plaintiff's cell door was "popped"— meaning that it was opened at a time when it was not supposed to open—presumably by

INITIAL REVIEW ORDER BY SCREENING JUDGE - 15

an unidentified correctional officer. *Id*. at 14. At the time, according to Plaintiff, a hard walk was "out in the dayroom[,] [t]hereby placing [Plaintiff] in imminent danger of serious physical injury." *Id*. Plaintiff was not assaulted or otherwise injured, and he does not state for how long his cell door was open before the door-popping mistake was corrected.

Plaintiff asserts that a "policy, practice and custom" of opening the wrong cell doors initially began over a decade ago, when a private company—not the IDOC—was operating the prison. *Id*. at 14–15. Plaintiff also alleges that another inmate, Inmate Lopez, had his door mistakenly popped several times. *Id*. The Court takes judicial notice that, in Inmate Lopez's own federal civil rights lawsuit, Lopez asserted that his cell door had been popped multiple times, but that these incidents of door-popping were "in error"—indicating that they were accidental. *Lopez v. Tewalt*, No. 1:21-cv-00255-BLW, Dkt. 1 at 9 (D. Idaho June 14, 2021).

On May 22, 2021, the power to Plaintiff's cell, as well as three other cells, went out. The power failure permitted a hard walk inmate to come up to Plaintiff's cell door and accuse Plaintiff's cellmate of "popping the breaker." The hard walk inmate "then attempted to force/jimmy [the] cell door open so as to assault [Plaintiff's] celly," but was unsuccessful. *Am. Compl*. at 15. The inmate then tried to "place a hit" on Plaintiff's cellmate, and a non-defendant correctional officer laughed about it. Plaintiff alleges that the May 22 power failure placed him in danger because it enabled the hard walk inmate to attempt to enter the cell to attack Plaintiff's cellmate.

### ii.   Specific Legal Standards for Failure-to-Protect Claims

A "prison official's duty under the Eighth Amendment is to ensure reasonable

safety, not absolute safety." *Martinez v. Field*, No. 1:17-CV-00337-DCN, 2020 WL

2576178, at *7 (D. Idaho May 21, 2020) (unpublished) (internal quotation marks omitted).

"General fears about being harmed by a fellow inmate or a prison gang are not enough" to

establish an Eighth Amendment violation:

> Inmates have no claim under the Eighth Amendment based on
> a general unsubstantiated fear of assault by a fellow inmate or
> by a specific group. Otherwise, courts would be flooded with
> prisoner litigation. Instead, to satisfy *Farmer*, the prisoner
> must present evidence of a particularized fear based upon prior
> threats or upon members of a specific group who have the
> motive and the ability to commit an assault themselves or
> through intermediaries.

*Id.* at *8; *see Savocchio v. Crabtree*, No. CV-97-1698-ST, 1999 WL 562692, at *5 (D. Or.

July 12, 1999) (unpublished) (holding that inmate satisfied burden of showing sufficiently

serious deprivation from fears of attack by gang members because petitioner "had long-

standing problems with members of [the gang], including a bad drug deal[,] … a contract

being placed on his life," and having been identified as a snitch).

   If an inmate faces a "threat of serious harm or injury" from another inmate, prison

officials who act with deliberate indifference to that threat are subject to liability under

§ 1983. *Berg v. Kincheloe*, 794 F.2d 457, 459 (9th Cir. 1986); *see also Farmer*, 511 U.S.

at 833 ("Having incarcerated persons with demonstrated proclivities for antisocial

criminal, and often violent, conduct, having stripped them of virtually every means of self-

protection and foreclosed their access to outside aid, the government and its officials are

not free to let the state of nature take its course.") (cleaned up). Deliberate indifference in

the context of a failure-to-protect claim does not require that a prison official knew the

plaintiff "was especially likely to be assaulted by the specific prisoner who eventually committed the assault." *Farmer*, 511 U.S. at 843. However, the deliberate indifference standard *does* mean that even an obvious and substantial risk of assault by one inmate against another does not result in liability so long as the defendant official was not subjectively aware of that risk. *Id*. at 844.

A prison housing policy that separates rival gangs from each other, but affords no similar separation to unaffiliated inmates, is not alone enough to plausibly suggest deliberate indifference to a substantial risk of serious harm posed by other inmates. *Nesbit v. Dep't of Pub. Safety*, 283 F. App'x 531, 534 (9th Cir. 2008). If, however, prison officials are aware that unaffiliated inmates are at a "significantly greater risk of assault" when housed with separated gang members, then such a policy may indeed violate the Eighth Amendment. *Id*.

The fact that a prison is understaffed does not itself violate the Eighth Amendment. *See Hoptowit*, 682 F.2d at 1247 ("If a challenged condition does not deprive inmates of one of the basic Eighth Amendment requirements, it is immune from Eighth Amendment attack.") (cleaned up), *abrogated on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995)). But, it that understaffing both places an inmate at a substantial risk of serious harm and resulted from prison officials' deliberate indifference, those officials will be liable under § 1983.

> iii.    The Amended Complaint Does Not State a Plausible Failure-to-Protect Claim

Plaintiff alleges that three different practices of the IDOC have combined to result

in violations of his Eighth Amendment right to be protected from a substantial risk of serious harm posed by other inmates: (1) "mixing walks," (2) "door popping," and (3) understaffing.[5] *Id.* at 14–15, 17–18. The Complaint also describes four relevant incidents: (1) the February 2021 assault against Plaintiff by a soft walk inmate; (2) the March 2021 assault against an LGBTQ prisoner by a soft walk inmate; (3) Plaintiff's cell door being "popped" while hard walk inmates were in the dayroom; and (4) Plaintiff's cellmate being targeted by a hard walk inmate, who, believing Plaintiff's cellmate was responsible for the power outage, tried but failed to get into the cell.

For the following reasons, the Complaint does not plausibly allege that any of these four instances, or any of the three practices Plaintiff describes, resulted from deliberate indifference on the part of prison officials.

Plaintiff alleges that the February 21 assault against him at IMSI was caused by prison officials' failure to properly assign a dangerous close-custody inmate to a hard walk instead of a soft walk. As described in the Complaint, the only information available to prison officials about the inmate who later assaulted Plaintiff was that, over a year earlier, the inmate had assaulted a different, unidentified prisoner at a different prison.

However, there is nothing to suggest that any Defendant was subjectively aware that

---

[5] Plaintiff also asserts that IDOC has a practice of "refusing, except in rare situations, to refer for prosecution the perpetrators of prisoner batteries, aggravated batteris [sic], assaults, and aggravated assaults, and hate crimes." *Am. Compl.* at 9. However, there is no constitutional right to have another person criminally prosecuted, and Plaintiff does not appear to assert an independent claim based on this practice. *See Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973) ("[A] private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another."); *Johnson v. Craft*, 673 F. Supp. 191, 193 (D. Miss. 1987) ("The decision to prosecute a particular crime is within the authority of the state, and there appears to be no federal constitutional right to have criminal wrongdoers brought to justice.").

the inmate would pose a substantial risk of serious harm to Plaintiff or any other soft walk inmate at IMSI. Given the length of time between the inmate's first attack and the one on Plaintiff—and the fact that the inmate attacked a different prisoner at a different prison— it was reasonable for prison officials to conclude that the inmate did not pose a substantial threat to inmates other than the one he had attacked at the other prison. Plaintiff does not allege that he notified Defendants of any particular threat, and instead relates only "[g]eneral fears about being harmed by [a hard walk inmate]." *Martinez*, 2020 WL 2576178, at *7. At most, the failure to assign the inmate to a hard walk may have been negligent. This is insufficient to support a reasonable inference that prison officials deliberately disregarded a known substantial risk of harm to Plaintiff posed by placing the other inmate on a soft walk.

The Complaint asserts that the second incident—the assault against the LGBTQ inmate by another soft walk prisoner at IMSI in March 2021—was caused by prison officials' practice of mixing walks. Plaintiff appears to assert that an unidentified STG inmate (on a hard walk) told the soft walk inmate who initiated the assault to attack "a vulnerable prisoner." *Am. Compl.* at 13. But the only allegation Plaintiff offers to support this conclusion is that the attacking inmate had previously told someone at a different prison that "he was going to put in a piece" when he got to IMSI. *Id*. Plaintiff does not allege that any Defendant actually heard this "put in a piece" statement or that, if they did, they also knew that the statement meant what Plaintiff believes it meant—that the inmate was planning to attack an unidentified inmate for an unknown reason on behalf of an unidentified STG inmate. In addition, Plaintiff has not plausibly alleged that he, as an

*unaffiliated* prisoner, was at a "significantly greater risk of assault" by a soft walk inmate who might or might not have been instructed, by an unidentified hard walk prison gang member, to attack another soft walk inmate. *See Nesbit*, 283 F. App'x at 534.

The third incident was the "door popping" of Plaintiff's cell door by unidentified "Security Staff" at ISCI—as a result of which nothing happened to anyone. The Complaint might suggest, at worst, that an unidentified correctional officer accidentally or negligently opened Plaintiff's cell door while hard walk inmates were in the dayroom. But negligence does not translate to liability under § 1983. Because the Complaint does not support a reasonable inference that prison officials actually knew of a substantial risk of harm posed by "door popping," Plaintiff has not plausibly alleged that the opening of his cell door was the result of prison officials' deliberate indifference. Plaintiff's references to other accidental incidents of door popping, his reliance on decade-old instances of door popping when a different entity ran the prison, and the mere fact that the prison was understaffed, simply do not give rise to a "reasonable inference that [any named Defendant] is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Finally, the fourth incident—the hard walk inmate at ISCC attempting to target Plaintiff's cellmate—was allegedly caused by a power failure, which permitted the hard walk inmate to leave his cell and try to get into Plaintiff's cell. But nothing even remotely suggests that the power failure resulted from Defendants' deliberate indifference. Power outages happen, and the Court cannot simply assume that a prison official subjectively knew of a substantial risk that the power would fail—and also drew the inference that the power failure would pose a substantial risk to serious harm to Plaintiff by another inmate—

and yet deliberately disregarded that risk.

For the reasons explained above, the Court must dismiss Plaintiff's § 1983 failure-to-protect claims as implausible.

### D.    Claims of Inadequate Medical Treatment

#### i.    Factual Allegations

As stated previously, during the February 2021 incident where another inmate assaulted Plaintiff, correctional officers ended the attack by using O/C Spray. Unfortunately, it was not just the attacker who was hit with the spray; Plaintiff was, too. The spray, in combination with the attack, caused "injuries to [Plaintiff's] eyes" and vision problems. *Am. Compl.* at 15.

After Plaintiff suffered these injuries, Plaintiff was evaluated by a Corizon medical provider named Steve. Steve determined that the injuries to Plaintiff's eyes were not so serious as to require a referral to an offsite provider or a trip to the hospital. Steve told Plaintiff he "would be seen at sick-call the next day[,] followed by a Doctor, PA, or NP-C after that." *Id*. at 11.

Plaintiff's sick call appointment took place on February 23, 2021. The appointment was with non-defendant medical provider M. Valley. Plaintiff contends that M. Valley did not actually "evaluate" him, but instead "only made a referral to the Eye Doctor to evaluate [Plaintiff's eye injuries and vision problems]." *Id*. at 15.

Plaintiff was supposed to be seen by an eye doctor on April 19, 2021, "but was not taken to the appointment nor was he given any reason by Defendant Jones who scheduled it." *Id*. Defendant Siegert told Plaintiff he would be evaluated in May 2021, but that

examination also failed to take place. Siegert later said Plaintiff would be seen in June 2021. *Id*. at 15–16.

At a medical appointment on an unknown date, Plaintiff "was told … he was scheduled for 6/15/21 for Optical but it didn't occur." *Id*. Non-defendant Evancho told Plaintiff that the eye doctor could not see all the patients who were scheduled. At the time Plaintiff filed the Amended Complaint on July 14, 2021, he still had not been evaluated by a medical provider with respect to his eye injuries and vision problems. *Id*.

        ii.       <u>Specific Legal Standards for Claims of Inadequate Medical Care</u>

The Eighth Amendment's protection against cruel and unusual punishments includes the right to adequate medical and mental health treatment in prison. Prison officials or prison medical providers can be held liable if their "acts or omissions [were] sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

Regarding the objective standard for Eighth Amendment medical treatment claims, "society does not expect that prisoners will have unqualified access to health care." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). Therefore, "deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Id*. The Ninth Circuit has defined a "serious medical need" in the following ways:

> failure to treat a prisoner's condition [that] could result in further significant injury or the unnecessary and wanton infliction of pain[;] … [t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain ….

*McGuckin v. Smith,* 974 F.2d 1050, 1059-60 (9th Cir. 1992) (internal citations omitted), *overruled on other grounds*, *WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc).

With respect to the subjective standard, deliberate indifference in the medical context can be "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle*, 429 U.S. at 104–05 (footnotes omitted). Medical malpractice or negligence does not support a cause of action under the Eighth Amendment, *Broughton v. Cutter Labs.*, 622 F.2d 458, 460 (9th Cir. 1980) (per curiam), and a delay in medical treatment does not violate the Eighth Amendment unless that delay causes further harm, *McGuckin*, 974 F.2d at 1060. Additionally, there is no constitutional right to an outside medical provider of one's own choice. *See Roberts v. Spalding,* 783 F.2d 867, 870 (9th Cir. 1986) ("A prison inmate has no independent constitutional right to outside medical care additional and supplemental to the medical care provided by the prison staff within the institution."). If medical personnel have been "consistently responsive to [the inmate's] medical needs," and the plaintiff has not shown that the medical personnel had "subjective knowledge and conscious disregard of a substantial risk of serious injury," there has been no Eighth Amendment violation. *Toguchi v. Chung*, 391 F.3d 1051, 1061 (9th Cir. 2004).

Non-medical prison personnel generally are entitled to rely on the opinions of medical professionals with respect to the medical treatment of an inmate. However, if "a

reasonable person would likely determine [the medical treatment] to be inferior," the fact that an official is not medically trained will not shield that official from liability for deliberate indifference. *Snow*, 681 F.3d at 986 (internal quotation marks omitted); *see also McGee v. Adams*, 721 F.3d 474, 483 (7th Cir. 2013) (stating that non-medical personnel may rely on medical opinions of health care professionals unless "they have a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner") (internal quotation marks omitted).

      iii.      <u>The Amended Complaint States Plausible Medical Treatment Claims against Defendants Corizon and Siegert, and against Defendant Christensen for Injunctive Relief</u>

Plaintiff asserts that Defendants Tewalt, Siegert, Jones, A. Nicodemus, and Corizon have failed to provide him with adequate medical treatment after his eyes were damaged from the OC spray. *Am. Compl*. at 18.

Plaintiff's Amended Complaint, liberally construed, appears to state colorable Eighth Amendment medical treatment claims against Defendants Corizon and Siegert. The repeated failure of unidentified Corizon employees to ensure Plaintiff was provided medical treatment raises a plausible inference that Corizon has a policy, custom, or practice amounting to deliberate indifference to serious medical needs. Plaintiff also has plausibly alleged that Defendant Seigert, the Health Services Director for the IDOC, knew of Plaintiff's multiple missed appointments, and yet did not ensure that the appointments occurred.

Because it appears that Defendant Christensen—the warden of ISCC—is the official with direct responsibility in the area in which Plaintiff seeks relief, Plaintiff may also

INITIAL REVIEW ORDER BY SCREENING JUDGE - 25

proceed on his medical treatment claim, for injunctive relief only, against Christensen. *See Rounds*, 166 F.3d at 1036. Christensen neither was personally involved with Plaintiff's medical treatment nor supervised that treatment; thus, Plaintiff may not proceed against Christensen for monetary damages. *See Taylor*, 880 F.2d at 1045; *Gonzalez*, 67 F. Supp. 3d at 1156.

The Amended Complaint does not state a plausible medical treatment claim against Defendants Tewalt, Jones, or A. Nicodemus. Of these three Defendants, only Defendant Jones had any involvement with Plaintiff's medical treatment at all. Jones scheduled Plaintiff for the initial April 19, 2021 medical appointment, which did not occur. *Am. Compl.* at 15. But there is nothing in the Amended Complaint plausibly suggesting that Jones—in addition to initially scheduling the appointment—also kept Plaintiff from *attending* that appointment and did so with a "sufficiently culpable state of mind." *Farmer*, 511 U.S. at 834 (internal quotation marks omitted).

Defendant Tewalt, as Director of the IDOC and an individual without medical training, did not and does not medically treat Plaintiff or supervise Plaintiff's treatment by Corizon health care providers. As for Defendant A. Nicodemus, Plaintiff alleges only that she is a Health Services Administrator for Corizon. Though Plaintiff believes Nicodemus was responsible "to follow through with scheduling Plaintiff for a timely eye appointment," *Am. Compl.* at 7, there are no facts to support a reasonable inference that she acted with deliberate indifference in failing to do so.

### E.    *State Law Claims*

Plaintiff asserts state law claims of negligence against Defendants Tewalt, Page,

Gentry, Davis, Baird, Gibney, Riely, and Ankenbrandt. Plaintiff contends that these Defendants failed to protect him from the February 2021 assault at IMSI (when Plaintiff himself was attacked) and from the March 2021 assault at IMSI (when an inmate with whom Plaintiff was speaking was attacked). *Am. Compl.* at 18.

These negligence claims do not arise under federal law, and the parties are not of diverse citizenship. *See* 28 U.S.C. § 1331, 1332. Therefore, unless the Court can exercise supplemental jurisdiction under 28 U.S.C. § 1367, Plaintiff's state law claims must be dismissed for lack of jurisdiction.

Section 1367 provides that a district court may exercise supplemental jurisdiction over state law claims when they are "so related" to claims over which the Court has original jurisdiction "that they form part of the same case or controversy under Article III of the United States Constitution." In other words, the supplemental jurisdiction power extends to all state and federal claims which one would ordinarily expect to be tried in one judicial proceeding. *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966). If the federal and state law claims do not "derive from a common nucleus of operative fact," a federal court may not exercise supplemental jurisdiction over the state law claims. *Id*.

Here, Plaintiff's negligence claims arise from the IDOC Defendants' alleged failure to protect Plaintiff from other inmates. However, the only federal claims upon which Plaintiff has been permitted to proceed involve the medical treatment provided by Corizon. Because these two types of claims do not share a common nucleus of operative fact, the Court lacks supplemental jurisdiction over Plaintiff's state law claims.

4.    **Conclusion**

Plaintiff may proceed as outlined above. This Order does not guarantee that any of Plaintiff's claims will be successful. Rather, it merely finds that some are plausible—meaning that they will not be summarily dismissed at this time but will proceed to the next stage of litigation. This Order is not intended to be a final or a comprehensive analysis of Plaintiff's claims.

Defendants may still file a motion for dismissal or motion for summary judgment if the facts and law support such a motion.[6] Because (1) prisoner filings must be afforded a liberal construction, (2) governmental officials often possess the evidence prisoners need to support their claims, and (3) many defenses are supported by governmental records, an early motion for summary judgment—rather than a motion to dismiss—is often a more appropriate vehicle for asserting procedural defenses such as non-exhaustion or entitlement to qualified immunity.

## ORDER

**IT IS ORDERED:**

1.    Plaintiff may proceed on his Eighth Amendment claims of inadequate medical treatment against Defendants Corizon and Siegert; Plaintiff may also proceed on an Eighth Amendment medical treatment claim against Defendant Christensen, for injunctive relief only. All other claims are

---

[6] The standards for a motion to dismiss for failure to state a claim under Rule 12(b)(6) are the same standards that the Court has used to screen the Amended Complaint under §§ 1915 and 1915A. Therefore, motions to dismiss for failure to state a claim are disfavored in cases subject to §§ 1915 and 1915A and may be filed only in extraordinary circumstances.

DISMISSED, and all other Defendants are TERMINATED as parties to this action. If Plaintiff later discovers facts sufficient to support a claim that has been dismissed, Plaintiff may move to further amend his Amended Complaint to assert such claims.[7]

2.      Defendants Corizon, Siegert, and Christensen will be allowed to waive service of summons by executing, or having their counsel execute, the Waiver of Service of Summons as provided by Fed. R. Civ. P. 4(d) and returning it to the Court within 30 days. If Defendants choose to return the Waiver of Service of Summons, the answer or pre-answer motion will be due in accordance with Rule 12(a)(1)(A)(ii). Accordingly, the Clerk of Court will forward a copy of the Amended Complaint (Dkt. 7), a copy of this Order, and a Waiver of Service of Summons to the following counsel:

a.      **Oscar Klaas**, Deputy Attorney General for the State of Idaho, Idaho Department of Corrections, 1299 North Orchard, Ste. 110, Boise, Idaho 83706, on behalf of Defendant Siegert.

b.      **Kevin West and Dylan Eaton,** Parsons Behle & Latimer, 800 W. Main Street, Suite 1300, Boise, Idaho, 83702, on behalf of Corizon.

---

[7] Any amended complaint must contain all of Plaintiff's allegations in a single pleading and cannot rely upon or incorporate by reference prior pleadings. Dist. Idaho Loc. Civ. R. 15.1 ("Any amendment to a pleading, whether filed as a matter of course or upon a motion to amend, must reproduce the entire pleading as amended. The proposed amended pleading must be submitted at the time of filing a motion to amend."); *see also Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1474 (9th Cir. 1997) ("[An] amended complaint supersedes the original, the latter being treated thereafter as non-existent."), *overruled in part on other grounds by Lacey v. Maricopa County*, 693 F.3d 896, (9th Cir. 2012) (en banc); *Hal Roach Studios, Inc. v. Richard Feiner and Co., Inc*., 896 F.2d 1542, 1546 (9th Cir. 1990) (holding that the district court erred by entering judgment against a party named in the initial complaint, but not in the amended complaint).

3.      Should any entity determine that the individuals for whom counsel for the entity was served with a waiver are not, in fact, its employees or former employees, or that its attorney will not be appearing for the entity or for particular former employees, it should file a notice within the CM/ECF system, with a copy mailed to Plaintiff, identifying the individuals for whom service will not be waived.

4.      If Plaintiff receives a notice from Defendants indicating that service will not be waived for an entity or for certain individuals, Plaintiff will have an additional 90 days from the date of such notice to file a notice of physical service addresses of the remaining Defendants, or claims against them may be dismissed without prejudice without further notice.

5.      The parties must follow the deadlines and guidelines in the Standard Disclosure and Discovery Order for Pro Se Prisoner Civil Rights Cases, issued with this Order.

6.      Any amended pleadings must be submitted, along with a motion to amend, within 150 days after entry of this Order.

7.      Dispositive motions must be filed no later than 300 days after entry of this Order.

8.      Each party must ensure that all documents filed with the Court are simultaneously served upon the opposing party (through counsel if the party has counsel) by first-class mail or via the CM/ECF system, pursuant to Federal Rule of Civil Procedure 5. Each party must sign and attach a proper

mailing certificate to each document filed with the court, showing the manner of service, date of service, address of service, and name of person upon whom service was made.

9.      The Court will not consider ex parte requests unless a motion may be heard ex parte according to the rules and the motion is clearly identified as requesting an ex parte order, pursuant to Local Rule of Civil Practice before the United States District Court for the District of Idaho 7.2. ("Ex parte" means that a party has provided a document to the court, but that the party did not provide a copy of the document to the other party to the litigation.)

10.     All Court filings requesting relief or requesting that the Court make a ruling or take an action of any kind must be in the form of a pleading or motion, with an appropriate caption designating the name of the pleading or motion, served on all parties to the litigation, pursuant to Federal Rule of Civil Procedure 7, 10 and 11, and Local Rules of Civil Practice before the United States District Court for the District of Idaho 5.1 and 7.1. The Court will not consider requests made in the form of letters.

11.     No party may have more than three pending motions before the Court at one time, and no party may file a motion on a particular subject matter if that party has another motion on the same subject matter currently pending before the Court. Motions submitted in violation of

this Order may be stricken, summarily denied, or returned to the moving party unfiled.

12.   Plaintiff must notify the Court immediately if Plaintiff's address changes. Failure to do so may be cause for dismissal of this case without further notice.

13.   Pursuant to General Order 324, this action is hereby returned to the Clerk of Court for random civil case assignment to a presiding judge, on the proportionate basis previously determined by the District Judges, having given due consideration to the existing caseload.

DATED: November 3, 2021

David C. Nye
Chief U.S. District Court Judge